## AFFIDAVIT

1.    I, Aaron M. Lee, a Special Agent of the Federal Bureau
of Investigation, Charleston, West Virginia Resident Agency, being
first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND BACKGROUND

2.    I am a Special Agent employed by the United States
Department of Justice in the Federal Bureau of Investigation
("FBI"), and as such I am a "federal law enforcement officer"
within the meaning of Fed. R. Crim. P. 41(a)(2)(C) authorized to
apply for federal seizure warrants.

3.    I have been employed as a Special Agent of the FBI since
January of 2019. I am currently assigned to the FBI Charleston
Resident Agency, Charleston, West Virginia. During my employment
with the FBI, I have been involved in several investigations,
including investigations into complex financial crimes, possession
and distribution of controlled substances, and matters of national
security. As part of my duties with the FBI, I investigate
violations of federal law, including offenses enumerated in Title
18 U.S.C. § 1343. I have been the affiant on search and seizure
warrants, and personally participated in the execution of search
and seizure warrants and making arrests.

4.    Prior to working for the FBI, I was employed as a
Correctional Officer in the West Virginia Division of Corrections

1

and Rehabilitation and the Federal Bureau of Prisons for more than three years. During my time as a Correctional Officer, I conducted searches for contraband and investigated violent crimes occurring within West Virginia prison facilities.

5.    The facts in this affidavit come from my personal observations, my training and experience, review of relevant records, and information obtained from other investigators and witnesses.

## PURPOSE

6.    This affidavit is intended to show merely that there is probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

7.    This ongoing investigation is financial in nature, thus, any figures I cite in this affidavit are based on calculations and tracing conducted to date and may be subject to revision at a later date.

8.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1343 and 18 U.S.C. § 1957 have been committed by Theodore Miller ("MILLER"). There is also probable cause to seize bank accounts facilitating those violations.

9.    This affidavit is made in support of separate applications, pursuant to 18 U.S.C. §§ 2323(a)(1)(A)-(B) and 981

2

for the issuance of seizure warrants for up to $434,501.42 in total
funds held in the following bank accounts (together, the "Subject
Accounts"):

    a. Account 7552005311 (hereinafter "**5311**") held at Fifth
Third Bancorp in the name of Bear Industries LLC,

    b. Account 7980825189 (hereinafter "**5189**") held at Fifth
Third Bancorp in the name of Deanna L. Drumm,

    c. Account 7552005162 (hereinafter "**5162**") held at Fifth
Third Bancorp in the name of Prestige Worldwide
Realestate LLC,

    d. Account 7552005154 (hereinafter "**5154**") held at Fifth
Third Bancorp in the name of T&C Construction Services,

    e. Account 7980924869 (hereinafter "**4869**") held at Fifth
Third Bancorp in the name of Theodore Miller, and

    f. Account held at Evolve Bank and Trust associated with
Stripe, Inc. token acct_1NB8o3B7lAFrOEQ8 in the name of
Bear Industries, LLC (hereinafter "**Stripe Account**").

10. The procedure by which the United States will seize the
Subject Bank Accounts is described herein.

### PROBABLE CAUSE

11. The FBI initiated this investigation on March 14, 2023,
based on a complaint it received from the West Virginia Securities
Commission. The West Virginia Securities Commission reported to
the FBI that MILLER was selling unregistered securities.

### Relevant Persons and Entities

12. MILLER is a United States citizen and a permanent
resident of South Charleston, Kanawha County, West Virginia,

3

within the Southern District of West Virginia. MILLER remained outside the United States from on or about February 12, 2022, to on or about August 8, 2024.

13. Based on publicly available information, MILLER owns several businesses registered in the State of West Virginia including, but not limited to, Bear Industries LLC, a real estate investment company, and T&C Construction LLC, a construction company.

14. Based on publicly available information, Bear Industries LLC is a single-member limited liability company registered in the State of West Virginia. Its sole member is MILLER. Its business address has been located in Charleston, Kanawha County, West Virginia, and Saint Albans, Kanawha County, West Virginia, within the Southern District of West Virginia.

15. Based on publicly available information, T&C Construction Services LLC is a single-member limited liability company registered in the State of West Virginia. Its sole member is MILLER. Its business address has been located in Saint Albans, Kanawha County, West Virginia, within the Southern District of West Virginia.

16. Based on publicly available information, Prestige World Wide Realestate LLC is a single-member limited liability company registered in the State of West Virginia. Its sole member is

4

MILLER. It was organized by MILLER and his former wife, C.M. Its business address has been located in Saint Albans, Kanawha County, West Virginia, within the Southern District of West Virginia.

17.   D.D. resides in South Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia. D.D. is an active participant in MILLER's businesses. In particular, she holds herself out as the Vice President of Bear Industries LLC. At all relevant times, D.D. regularly managed finances, signed documents, facilitated business deals and transactions, and handled business communications. D.D. acted as MILLER's agent while he remained outside of the United States.

18.   Fifth Third Bancorp ("Fifth Third") is an FDIC-insured bank with branches throughout the Southern District of West Virginia, including Charleston, Kanawha County, West Virginia. Fifth Third is a financial institution as defined by 18 U.S.C. § 20 and is a financial institution which engaged in, and the activities of which, affected interstate commerce, as defined in 31 U.S.C. § 5312(a)(2).

19.   Paypal, Inc. ("Paypal") is a merchant service provider payment processing platform. The company is headquartered in San Jose, California. Its servers are located outside of the State of West Virginia. Users can link their bank accounts and transfer money to another user using wire communications through the

5

Internet.

20.  Stripe, Inc. ("Stripe") is a merchant service provider payment processing platform. Stripe has dual headquarters in San Francisco, California, and Dublin, Ireland. Its servers are located outside the State of West Virginia. Users can link their bank accounts and transfer money to another user using a wire communication through the Internet. Banking services for Stripe are provided by Evolve Bank and Trust.

21.  Evolve Bank and Trust ("Evolve Bank") is an FDIC-insured bank headquartered in Memphis, Tennessee, in the Western District of Tennessee. Evolve Bank is a financial institution as defined by 18 U.S.C. § 20 and is a financial institution which engaged in, and the activities of which, affected interstate commerce, as defined in 31 U.S.C. § 5312(a)(2).

## The Schemes

22.  Beginning as early as October 2021, MILLER, aided and abetted by D.D. and other individuals both known and unknown to law enforcement, conceived and perpetrated two fraudulent schemes to bolster his businesses' monthly cash flow and to pay unrelated personal and professional debts, obligations, and expenses:

   a. **The Bear Lute Scheme**: A scheme to defraud investors by inducing them to invest in a pooled real estate investment vehicle, "Bear Lute," through material misrepresentations, false promises, and omissions about, inter alia, the prior performance of Bear Lute, the

6

validity of the investors' security interest, the safety of the investment, MILLER's financial status, the timeline for return of funds, and the purpose for which the funds would be used; and then by misappropriating the funds for unrelated personal and business expenses.

b. **The Direct Investment Scheme**: A scheme to defraud investors by inducing them to invest in specific real estate projects, "direct investments," located on Bigley Avenue in Charleston, Kanawha County, West Virginia, through material misrepresentations, false promises, and omissions about, inter alia, the validity of the investors' security interest, the safety of the investment, MILLER's financial status, and the purpose for which the funds would be used; and then by misappropriating the funds for unrelated personal and business expenses.

### The Bear Lute Scheme

23. MILLER controlled a real estate investment program, "Bear Lute," which was affiliated with Bear Industries LLC. As part of Bear Lute, investors gave MILLER money to invest in real estate properties on the promise that they would achieve an extraordinary rate of return over a period of months or years. Bear Lute was administered primarily through bearlute.com.

24. MILLER promoted Bear Lute through social media, where he had amassed a large following. He regularly posted videos and other information promoting Bear Lute and directed viewers to bearlute.com.

25. As of September 10, 2024, bearlute.com contained the following representations regarding the program and MILLER, among

7

others:[1]

    a. "Our founder Teddy Miller started the company mid 2018 as a side business to create passive income in addition to his construction company and other businesses. At first he was very skeptical, and had no idea he had just created something that would eventually change his life." (https://bearlute.com/about-us/)

    b. "Bearlute is an investment product of Bear Industries designed to essentially allow everyday individuals to become the bank and lend money to Bear Industries for their real estate projects. Which consist of rebuilding abandoned and distressed properties into modern and affordable rental property that is designed to turn an incredible profit while also making a difference in the community around it." (https://bearlute.com/)

    c. "Bear Industries is a real estate development company that operates throughout the United States specialize in the rebuilding of abandoned and distressed properties into affordable, modern rental property to either be held or sold for a profit." (https://bearlute.com/about-us/)

    d. "Bear Industries has holdings in multiple locations, produces several million in annual revenue, and 20% of their current funding comes directly from investors. Who have been extremely happy with their success with this company." (https://bearlute.com/about-us/)

26. As of September 10, 2024, the "How it Works" section of bearlute.com outlined the steps for how Bear Lute functioned. (https://bearlute.com/how-it-works/):

    a. First, investors "SIGN UP AND DEPOSIT FOUNDS[.] You can choose from one of your standard investment plans or choose to invest a lump sum into your account."

    b. Second, investors "START EARNING INTEREST[.] From the

---

[1] Quotations from bearlute.com have not been altered unless noted. Typographical and grammatical mistakes are original to the websites.

moment you deposit funds into your account you will start earning 6% annum interest which will be deposited monthly into your account."

c. Third, investors "RECEIVE QUARTERLY GIFTS[.] Every 3 months you are eligible to receive a gift based on the average balance of your account and the profitability of our projects in that time."

d. Fourth, investors "REINVEST YOUR PROFITS TO MAKE MORE MONEY[.] All interest and gifts are automatically accrued and put to work making you additional profit unless you opt to receive them."



27. As of September 10, 2024, bearlute.com promised consistent standard returns, that the investment was "safe and secure," and that funds would be returned within 60 days upon request.

9

# EXPECTATIONS

When you invest with Bearlute.com you are partnering with Bear Industries and Teddy Miller on their path to build a bigger empire, and with that comes some perks!

 CONSISTENT STADARD RETURN      MONEY IS SAFE AND SECURE      60 DAYS RETURN OF INVESTED CASH

28. As of September 10, 2024, bearlute.com explained that after an investor invests in Bear Lute, he or she will "be given exclusive access to your investment portal" where the investor can "Track Your Deposits[;] Track Your Interest Payments[;] Track You Quarte[r]ly Gifts[;] Monitor Your Current Investment Performance[;] Monitor Your Expected Annual Return[;] Adjust your Investment Plan[;] Access Exclusive Direct Investment Opportunities for Bear Investors to Make More Money[;] And so much more!" (https://bearlute.com/exclusive-access/)



29.  As of September 10, 2024, bearlute.com contained several "Sign Up" buttons that directed visitors to bearlute.com/signup.



30.  Bearlute.com/signup  contained  the  following representation: "Let's Build a Fucking Empire!!! By Signing up for BearLute.com You Are Agreeing To Essentially Become The Bank For Teddy Miller's Real Estate Development Company Bear Industries, LLC In Exchange For a Cut of His Profits From Rebuilding Properties Around  The  United  States."  Investors  could  choose  between different  investment  packages  and  could  invest  money  directly  by using an online payment system.



31. As of September 10, 2024, bearlute.com's associated
Terms of Service page (https://bearlute.com/terms-and-conditions-
2/) provided that investors' "membership includes access to an
exclusive server for you to monitor your account, adjust your
monthly deposits, request a withdrawal, and see your projected
annual return based on your current settings." It also provided
that "Every Withdraw From BearLute.com is processed and completed
within 60 days following the initial request. This is due to your
funds being used in active projects, and it takes time to
reallocate the cash without stalling a projects completion."

32. As of September 10, 2024, bearlute.com contained pictures of MILLER.



33. Upon information and belief, at all relevant times, bearlute.com maintained representations substantially similar to or the same as those noted above.

34. On September 23, 2024, the FBI seized bearlute.com pursuant to a federal seizure warrant.

**Bear Lute Victims E.S. & B.W.**

35. On or about August 14, 2022, victim B.W. signed up for Bear Lute after viewing bearlute.com. He began making monthly investments of $2,500, in reliance on MILLER's misrepresentations

13

and promises about Bear Lute, some of which appeared on bearlute.com.

36. B.W.'s deposits were deducted from his bank account in Texas, processed by Paypal, and deposited in MILLER's bank account ending in **5154** in the name of T&C Construction LLC at Fifth Third in Charleston, West Virginia, on the following dates: August 15, 2022, September 15, 2022, October 13, 2022, November 20, 2022, and December 12, 2022.

37. On or about October 12, 2022, E.S. signed up for Bear Lute after viewing bearlute.com. He made a one-time deposit of $5,000, in reliance on THEODORE MILLER's representations and promises about Bear Lute, some of which appeared on bearlute.com.

38. E.S.'s deposit was deducted from his bank account in Texas, processed by Paypal, and deposited in THEODORE MILLER's bank account ending in **5154** in the name of T&C Construction LLC at Fifth Third in Charleston, West Virginia. E.S.'s money was deducted in two $2,500 increments on or about October 13 and 14 of 2022.

39. Nearly all of MILLER's representations and promises about Bear Lute on bearlute.com were untrue.

40. Based on a review of financial records, investor funds were not pooled and deployed on real estate projects or transactions as described. Rather, as the Bear Lute funds were

available, MILLER used the funds to his and D.D.'s personal benefit and to the benefit of MILLER's other businesses.

41. MILLER did not perform any cash out refinances on properties that would have generated returns in excess of 6 percent for Bear Lute investors.

42. The returns and quarterly distributions investors could view in the investor dashboard were not based on any real account figures. While the investor dashboard showed investments "growing," MILLER's businesses' total available cash was consistently decreasing.

43. MILLER did not honor withdraw requests within 60 days. Specifically, MILLER never returned B.W.'s and E.S.'s investments after they made withdraw requests.

44. MILLER also failed to disclose to investors, including B.W. and E.S., that the West Virginia Securities Commission ordered him to cease and desist operating Bear Lute in or around November of 2022.

45. MILLER ceased all communications with investors E.S. and B.W. after they made requests for withdrawal.

**The Direct Investment Scheme**

46. From at least June 3, 2022, through at least September 8, 2022, at or near Charleston, Kanawha County, West Virginia, within the Southern District of West Virginia, and elsewhere,

MILLER, aided and abetted by individuals both known and unknown to law enforcement, knowingly participated in a scheme to defraud real estate project investors, in violation of 18 U.S.C. § 1343.

47.   In furtherance of the fraud, MILLER carried out the scheme in the following manner:

**The Dry-Storage Lot Project: Victims C.T. & J.C.**

48.   In the spring of 2022, MILLER began soliciting investments for a project to construct a dry-storage lot at "1017" and 1019 Bigley Avenue, and to make improvements to a home located at 1021 Bigley Avenue in Charleston, West Virginia (the "dry-storage lot project").

49.   He solicited investments, in part, by posting videos on his social media accounts, where he also regularly misrepresented himself as a successful, wealthy businessman.

50.   From approximately July 5, 2022, to July 20, 2022, MILLER, aided and abetted by individuals known and unknown to law enforcement, fraudulently induced investments totaling $60,000 in the dry-storage lot project from two investors: $20,000 from C.T. and $40,000 from J.C.

51.   MILLER provided C.T. with a project prospectus in or around June 2022. The prospectus falsely promised, inter alia, that:

     a. MILLER would rehabilitate a small dwelling located at 1021 Bigley Avenue.

     b. MILLER would construct a dry-storage lot at 1017 and 1019 Bigley Avenue, between 1007 Bigley Avenue and 1021 Bigley Avenue. Construction of the dry-storage lot would include clearing, leveling, and graveling the lot and installing a fence and security system.

     c. MILLER would treat an investment as a construction loan to complete the project. If MILLER could not raise the total capital needed, $185,826.84, MILLER would allow investors to redirect their investment.

     d. Once construction was complete, MILLER would refinance the property, and investors would receive their initial investment back, plus an additional return. After, investors and MILLER would share in the rental income from the dwelling and dry-storage lot.

56. After C.T. reviewed the prospectus, MILLER misrepresented to C.T. during a phone call that he controlled the limited liability company that owned the dry-storage lot project property. MILLER made other misrepresentations to C.T. in one-on-one communications designed to induce C.T.'s investment.

57. C.T. ultimately decided to invest $20,000 in the dry-storage lot project. C.T. and MILLER entered into an "Investor Agreement" and a "Partnership Agreement" in June 2022. The Investor Agreement falsely promised that C.T.'s funds would be used for the dry-storage lot project property only, that C.T.'s investment was secured by the dry-storage lot project property, and that MILLER would repay C.T. $20,000 plus 15 percent of the refinance proceeds

17

by August 2, 2023. The Partnership Agreement governed how rental income would later be divided.

58. C.T. then wired $20,000 from California to MILLER on or about July 5, 2022. The wire was deposited into MILLER's Bear Industries LLC Fifth Third bank account ending in **5311** in Charleston, West Virginia.

59. C.T.'s wire was sent in reliance on MILLER's false promises and misrepresentations in the prospectus, the Investor Agreement, during the phone call, in one-on-one communications, in the Partnership Agreement, and on social media.

60. Defendant THEODORE MILLER provided J.C. with the same project prospectus between June and July of 2022.

61. MILLER provided J.C. with additional investment materials related to the dry-storage lot project in July 2022. The additional materials misrepresented, inter alia, that investor money would be used as a down payment on a construction loan.

62. J.C. decided to invest $40,000 in the project. He wired $20,000 from Florida to MILLER on or about July 19, 2022. He wired another $20,000 from Florida to MILLER on or about July 20, 2022. The wires were deposited into MILLER's Bear Industries LLC Fifth Third bank account ending in **5311** in Charleston, West Virginia.

63. J.C's wires were sent in reliance on MILLER's false promises and misrepresentations in the prospectus, the additional materials, and on social media.

64. Upon receiving the investments, MILLER did not do as he had promised. MILLER did not rehabilitate the home at 1021 Bigley Avenue; construct a dry-storage lot; give C.T. or J.C. an opportunity to redirect their investment when he did not raise the total capital requirement; refinance the property; or pay investors.

65. Additionally, at the time of the investments, MILLER was not in a strong financial position.

66. MILLER also never owned the dry-storage lot project property, as represented. Therefore, C.T. could never have had a valid security interest therein. Nor could MILLER have ever owned "1017" Bigley Avenue, as it was not a valid address.

67. MILLER did not use the entirety of the investors' funds for the dry-storage lot project. Nor did he use the investments as a down payment on a construction loan. Instead, MILLER put most of the funds to his own and D.D.'s benefit, directing the money toward personal expenses, private investments, and other business expenses.

68. In furtherance of the scheme, MILLER sent J.C. and C.T. lulling communications. For example, in March 2023, knowing full-

well that he had not completed the dry-storage lot project, MILLER told J.C. that J.C. would receive his first project disbursement at the end of the next month and to expect that his disbursements would increase "as the site fills up." J.C. never received a disbursement.

69. In furtherance of the scheme, MILLER ceased all contact with C.T. and J.C. after they began inquiring further about the dry-storage lot project.

**The Duplex Projects: Victims J.C. & B.W.**

70. In or around Spring of 2022, and while MILLER was promoting the dry-storage lot project, MILLER began soliciting investments for the development of duplexes located at 915 and 917 Bigley Avenue, Charleston, Kanawha County, West Virginia, the ("915 Bigley duplex project" and the "917 Bigley duplex project").

71. He solicited investments, in part, by posting videos on his social media accounts, where he also regularly mispresented himself as a successful, wealthy businessman.

72. From approximately July 14, 2022, to September 8, 2022, MILLER fraudulently induced investments totaling $30,000 in the duplex projects from two investors: $20,000 from J.C. for the 915 Bigley duplex project and $10,000 from B.W for the 917 Bigley duplex project.

73. In June 2022, MILLER provided investment materials regarding the 915 Bigley duplex project to J.C. The materials included, inter alia, the following misrepresentations, and false promises and information:

    a. MILLER would redevelop the single-family residence located at 915 Bigley Avenue into a fully remodeled duplex.

    b. MILLER would use the investment funds for a down payment on a construction loan.

    c. Construction of the duplex would involve installing modern kitchens, hardwood flooring, modern bathrooms, and brushed nickel lighting.

    d. After construction was complete, MILLER would rent the duplex units and refinance the property. Upon refinance, the investors' funds would be returned plus a portion of the increased equity.

    e. The investment was "safe and secure" because the investment would be personally guaranteed by MILLER and secured by the duplex property.

74. MILLER also provided J.C. with a property report for 915 Bigley Avenue that included projections for the project and technical specifications for the property.

75. Between June and July of 2022, MILLER made numerous misrepresentations to J.C. during one-on-one communications designed to induce J.C.'s investment.

76. J.C. decided to invest $20,000 in the 915 Bigley duplex project. On July 14, 2022, J.C. and MILLER entered into an "Investor Agreement" and a "Partnership Agreement." The Investor

21

Agreement misrepresented that J.C.'s investment was secured by 915 Bigley Avenue, and falsely promised that MILLER would repay J.C. $20,000 plus additional money from the refinance by July 24, 2024. The Partnership Agreement governed how rental income would later be divided.

77. J.C. wired $20,000 from Florida to MILLER on or about July 14, 2022. The wire was deposited into defendant THEODORE MILLER's Bear Industries LLC Fifth Third bank account ending in **5311** in Charleston, West Virginia.

78. J.C's wire was sent in reliance on MILLER's false promises and misrepresentations contained in the investment materials, their one-on-one communications, the Investor Agreement, the Partnership Agreement, and on social media.

79. In or around September 2022, MILLER provided investment information regarding the 917 Bigley duplex project to B.W. The information included, inter alia, the following misrepresentations and false promises and information:

      a. MILLER would use the investment to redevelop the single-family residence located at 917 Bigley Avenue into a fully remodeled duplex;

      b. Construction of the duplex would involve a total remodel;

      c. After construction was complete, MILLER would rent the duplex units and refinance the property. Investors would receive quarterly distributions and upon refinance, the

investors' funds would be returned plus a portion of the increased equity;

d. The investment was "safe" because the investment would be personally guaranteed by MILLER and secured by the duplex property, a tangible asset; and

e. MILLER owned a "large amount" of rental property near 917 Bigley Avenue.

80. B.W. decided to invest $10,000 in the 917 Bigley duplex project. On September 7, 2022, B.W. and MILLER entered into an "Investor Agreement" and a "Partnership Agreement." The Investor Agreement falsely promised that B.W.'s funds would be used for the 917 Bigley Avenue duplex only, that B.W.'s investment was secured by 917 Bigley Avenue, and that MILLER would repay J.C. $10,000 plus additional money from the refinance by September 7, 2024. The Partnership Agreement governed how rental income would later be divided.

81. B.W. wired $10,000 from Texas to MILLER on or about September 8, 2022. The wire was deposited into MILLER's Bear Industries LLC Fifth Third bank account ending in **5311** in Charleston, West Virginia.

82. B.W.'s wire was sent in reliance on MILLER's false promises and misrepresentations in the investment information, the Investor Agreement, the Partnership Agreement, and on social media.

23

83. At the time of the investments, MILLER was not in a strong financial position.

84. Additionally, MILLER did not do as he had promised. He did not remodel the homes at 915 and 917 Bigley Avenue, and he never refinanced the properties or paid investors.

85. Further, MILLER never owned 915 or 917 Bigley Avenue, as represented. Therefore, B.W. could never have had a valid security interest therein. MILLER also never owned a "large amount" of rental property near 915 or 917 Bigley Avenue.

86. MILLER did not use the entirety of the investors' funds for the duplex projects. Nor did he use the investments as a down payment on a construction loan. Instead, MILLER put most of the funds toward his own and D.D.'s benefit, directing the money to personal expenses, private investments, and other business expenses.

88. In furtherance of the scheme, MILLER ceased all contact with J.C. and B.W. after they began inquiring further about the duplex projects.

### Account Analysis

89. MILLER received a total of approximately $434,501.42 from his fraudulent schemes.

90.   Investors sent MILLER a total of $95,000 for the direct investment scheme. Those funds were deposited into **5311** and **5154** as follows:

| Date    (on    or about) | Victim | Receiving Account | Amount Sent |
|---|---|---|---|
| July 5, 2022 | C.T. | 5311 | $20,000 |
| July 14, 2022 | J.C. | 5311 | $20,000 |
| July 19, 2022 | J.C. | 5311 | $20,000 |
| July 20, 2022 | J.C. | 5311 | $20,000 |
| September 8, 2022 | B.W. | 5311 | $10,000 |
| October 17, 2022 | A.G. | 5154 | $5,000 |

91.   Investors sent MILLER a total of $339,917.90[2] for the Bear Lute scheme. The funds were deposited into the Subject Bank Accounts as follows:

| Date Range (on or about) | Payment Processor | Receiving Account | Total Amount |
|---|---|---|---|
| June 30, 2022 to July 14,2024 | Paypal | **5189, 4869, 5154** | $168,502.90 |
| May 24, 2023 to September 20, 2024 | Stripe | **5311, 5162** through the **Stripe Account** | $149,415.00 |
| October 13, 2022 | Square[3] | **5311** | $22,000.00 |

---

[2] Note that MILLER repaid one investor $416.48, so the total loss amount associated with Bear Lute is calculated as $339,501.42.

[3] Square is a business technology company and payment processor owned and managed by Block, Inc., which is headquartered in Oakland, California. MILLER used Square to process a single Bear Lute investment on or about October 13, 2022, from victim W.K.C. totaling $22,000.

92.  Investor funds from Bear Lute and the direct investment schemes were commingled with and transferred between other accounts including **5189**, **5162**, and **4869**. For example,

  a. C.T.'s $20,000 investment deposited into **5311** on July 5, 2022, was transferred as follows:

| Date (on or about) | Description |
|---|---|
| 7/5/2022 | $20,000 investment from C.T. deposited into **5311** |
| 7/6/2022 | $5,266.64 transfer from **5311** to **5162** |
| 7/7/2022 | $84.00 transfer from **5311** to **5189** |
| 7/8/2022 | $900.00 transfer from **5311** to **5162** |
| 7/8/2022 | $4,000.00 transfer from **5311** to **4869** |
| 7/8/2022 | Checks written from **5311** to contractors (C.G., C.K., and B.A.) in total amount of $1,872.10 |
| 7/14/2022 | $7,800.00 transfer from **5311** to **5162** |

  b. J.C.'s $20,000 investment on July 20, 2022, was transferred as follows:

| Date (on or about) | Description |
|---|---|
| 7/20/2022 | $20,000 investment from J.C. deposited into **5311** |
| 7/22/2022 | Checks written from **5311** to contractors (C.G. and C.K.) in total amount of $2,208.00 |
| 7/25/2022 | $10,000 transfer from **5311** to **5154** |
| 7/25/2022 | Check written from **5311** to contractor (B.A.) for $2,096.09. |
| 7/27/2022 | $1,000.00 transfer from **5311** to **5162** |
| 7/27/2022 | $5,000.00 transfer from **5311** to **4869** |

  c. And, $20,000 of the direct investment money was transferred on July 20, 2022, from **5311** to **5154**.

93.  Additionally, taking a conservative sample from just July 2023 to July 2024, a time when Bear Lute was the primary source of income for MILLER, $34,650.00 was transferred from either **5311** or **5154** to MILLER's personal account, **4869**. Likewise,

26

$48,423.01 was transferred from either **5311** or **5154** to D.D.'s personal account, **5189.**

## STATUTORY BASIS FOR SEIZURE AND FORFEITURE

94.   18 U.S.C. § 981(b) provides, in relevant part, that any property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, or any facilitating property involved in violation of 18 U.S.C. § 1343 are subject to civil forfeiture to the United States Government.

95.   21 U.S.C. § 853(e) & (f) by 28 U.S.C. § 2461 provides, in relevant part, that any property, real or personal, involved in or facilitating, or any property traceable to such property involved in a violation of 18 U.S.C. § 1343 shall be forfeited to the United States.

96.   21 U.S.C. § 853(e) & (f) by 18 U.S.C. § 982(b)(1) provides, in relevant part, that any property, real or personal, involved in or facilitating, or any property traceable to such property involved in a violation of 18 U.S.C. § 1957 shall be forfeited to the United States.

97.   18, U.S.C. § 981(b)(1) authorizes seizure of property subject to civil forfeiture based upon a warrant supported by probable cause. 18, U.S.C. § 981(b)(3) permits the issuance of a seizure warrant by a judicial officer in any district in which a forfeiture action against the property may be filed and may be

27

executed in any district in which the property is found.

98.    As set forth above, there is probable cause to believe that the Subject Bank Account is subject to both civil and criminal forfeiture because it was used to commit wire fraud and money laundering.

### SEIZURE PROCEDURE

99.    Upon execution of the seizure warrant, Evolve Bank shall be directed to restrain and lock the Subject Bank Account pending transfer of all right, title, and interest in the Subject Bank Account to the United States upon completion of forfeiture proceedings to ensure that changes to the Subject Bank Account cannot be made absent court order or, if forfeited to the United States, without prior consultation with the FBI and/or the United States Department of Justice.

## CONCLUSION

101. Based on the information contained in this affidavit, I submit that there is probable cause to believe that the Subject Bank Account are property that have been used, or are intended to be used, to commit or facilitate wire fraud and money laundering. Accordingly, the Subject Bank Account are subject to civil forfeiture and criminal forfeiture.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully submitted by:

Aaron M. Lee, Special Agent
Federal Bureau of Investigation

Signed and sworn to by telephone this ___1st___ day of November, 2024.

s/Charmiane G. Claxton

CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE